UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

ALYSSA LLOYD,                                                    :
                                                                :
                                        Plaintiff,              :
                                                                :                1:14-cv-9968-GHW
                        -v-                                      :
                                                                :                MEMORANDUM OPINION
                                                                :                AND ORDER
THE CITY OF NEW YORK, New York City                             :
Police Department Officers GREGORY GRAVES,                      :
JAMES RUFLE, DAVID MILLS, PAUL BYRNE,                           :
AND UNDERCOVER OFFICER 137, and,                                :
CORIZON HEALTH, INC., MOHAMMAD                                  :
ALAM,                                                           :
                                                                :
                                        Defendants.             :

---------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/31/17

GREGORY H. WOODS, United States District Judge:

   Ms. Alyssa Lloyd worked for a number of years coordinating appointments for escorts.  She

asserts that the liaisons that she arranged were not sexual, but nonetheless, she was caught up in an

undercover sting targeting suspected prostitution in her workplace.  The officers who rushed in to

arrest her and others did not know at first that Ms. Lloyd was a recovering breast cancer survivor.

They did not know when they pushed her to the ground that her breasts had recently been removed,

and that her surgical breast reconstruction had not healed and was fragile.  Ms. Lloyd says that the

officers did know those facts, however, when they handcuffed her behind her back, tearing the

stitches in her chest.  In this case, Ms. Lloyd brings a claim of excessive force against the officers

who pushed her to the ground and handcuffed her.  She also claims that the officers, and the doctor

who later evaluated her in jail, were indifferent to her medical needs.  Because there are disputed

issues of fact regarding the circumstances of her arrest and the officers' handcuffing of Plaintiff, the

officers' motion for summary judgment for her claims of excessive force are denied.  Ms. Lloyd's

constitutional claims related to deliberate indifference to her medical needs, however, are dismissed,

principally because the officers offered her treatment after her arrest which she declined.

I.       **BACKGROUND**

    A. **Factual Background**[1]

        1.   **Ms. Lloyd's Cancer Diagnosis and Treatment**

Plaintiff, Ms. Alyssa Lloyd, worked "arranging dates" for women who advertised their services as escorts—booking appointments by telephone.  At the time of the events in this case, she was in her early 40s.  She had arrived at her job as a liaison between escorts and their customers after a long path, dropping out of New York University, taking massage classes, and working for some time as a nanny in Westchester.

Ms. Lloyd's life changed in August 2012, when she was diagnosed with breast cancer. Plaintiff's Response to Medical Defendants' Local Rule 56.1 Statement (Dkt. No. 111) ("Pl. Med. 56.1") ¶¶ 88-90.  After her diagnosis in late 2012, Ms. Lloyd was treated with chemotherapy, which significantly improved her condition.  *Id.* ¶¶ 91-92.  However, in order to treat her cancer, Ms. Lloyd also decided to undergo a double mastectomy—surgical removal of both of her breasts.  *Id.* ¶ 96.

In the early summer of 2013, with her mastectomy approaching, Ms. Lloyd began to consult with a plastic surgeon about options to reconstruct her breasts.  On June 6, 2013, Ms. Lloyd met for the first time with her plastic surgeon, Dr. Cherry Chang, M.D.  *Id.* ¶¶ 93, 96.  After conferring with Dr. Chang, Ms. Lloyd decided to reconstruct her breasts immediately after their removal, using surgically-implanted breast expanders which would be inflated through injections of saline.  *Id.* ¶¶ 101, 112.  Breast implantation, like any surgery, comes with risks.  And Dr. Chang reviewed the risks associated with breast reconstruction generally, and particularly the issues associated with breast implants.  The risks were significant:  infection, wound healing issues, unfavorable scarring,

---

[1]  These facts are not disputed for purposes of this motion, or are taken in the light most favorable to Plaintiff.  *See Mitchell v. City of New York*, 841 F.3d 72, 75 (2d Cir. 2016) (at summary judgment, a court "views the evidentiary record in the light most favorable to . . . the non-moving party").

asymmetry, implant failure, and the possibility of requiring future corrective surgery, among others. *Id.* ¶¶ 103-06.  Because Ms. Lloyd would also need radiation therapy even after the mastectomy, she was at risk for still further complications.  *Id.* ¶ 107.

Ms. Lloyd's breasts were removed during an operation on June 17, 2013.  *Id.* ¶ 108.  During the same surgery, Dr. Chang inserted two tissue expanders and implants into her breasts—the first of many steps in Plaintiff's breast reconstruction.  *Id.* ¶ 109.  The next step—inflation of the tissue expanders using saline injections—began in July 2013 and continued through September 2013.  *Id.* ¶¶ 112-137.  Unfortunately, early in her treatment, Ms. Lloyd began to experience complications from the procedure.  Beginning in early August 2013, Plaintiff began to complain that saline was leaking from her right tissue expander.  *Id.* ¶ 114.  Dr. Chang reacted promptly; in a surgical procedure on August 23, he removed Ms. Lloyd's right implant and exchanged her right tissue expander.  *Id.* ¶¶ 129-30.

Following the surgery, Ms. Lloyd was allowed to exercise "a little."  Plaintiff's Response to City Defendants' Local Rule 56.1 Statement ("Pl. City 56.1") ¶ 218.  But the repair proved fragile. In mid-September, the stitches in Ms. Lloyd's chest ripped while she was making her bed, doing nothing more than stretching her arm to spread a comforter.  Pl. City 56.1 ¶ 219.  Sticky, salty fluid that Ms. Lloyd believed to be saline leaked from the wound, irritating her skin.  *Id.* ¶ 220.

So only four weeks after the replacement of her right expander, on September 17, Plaintiff was back in Dr. Chang's office.  Pl. Med. 56.1 ¶ 138.  That very morning, Plaintiff had noticed some leakage from her right breast incision.  *Id.* ¶ 139.  During her visit, Dr. Chang found that some of Ms. Lloyd's sutures were coming apart, and, perhaps, some leakage.  Dr. Chang sutured the incision closed.  *Id.* ¶ 140.  He also prescribed Cefadroxil, an antibiotic.  Ms. Lloyd was directed to take two pills of the medication per day over the course of one week.  *Id.* ¶¶ 142-43.

But the problems did not end.  Ms. Lloyd returned to Dr. Chang's office two days later, on

September 19, 2013, again reporting persistent saline leakage.  *Id.* ¶ 144-45.  Dr. Chang decided that

an operation was necessary to again replace Ms. Lloyd's right tissue expander.  *Id.* ¶ 146.  He

scheduled the surgery to take place four days later—September 23, 2013.  *Id.* ¶ 149.  Ms. Lloyd

would not make it to her surgery that day.  Instead, because of the events that unfolded next, she

would be on Rikers Island.

### 2.  The Events of September 20, 2013

#### a.  Plaintiff's Arrest

Detective James Rufle worked for the New York City Police Department Vice Major Case

Squad.  As its name suggests, the squad targets prostitution and vice-related crimes.  In September

2013, Detective Rufle was investigating Ms. Lloyd and the business where she worked at 408 East

64th Street in Manhattan.  Pl. City. 56.1 ¶¶ 1-2.  As described above, Ms. Lloyd worked as a liaison,

connecting men and women who, occasionally, met at her workplace.  The police suspected that Ms.

Lloyd was running a website that was promoting prostitution.  *Id.* ¶ 3.  On September 20, 2013, the

police organized a "buy and bust" tactical operation at Ms. Lloyd's place of work.  The team

assembled for the operation included Detective Rufle, together with Detectives Paul Byrne and

David Mills, Sergeant Gregory Graves, and one undercover officer—known here only by his

codename, UC 137.  *Id.* ¶¶ 4-5.[2]

Early in the operation, UC 137 called Ms. Lloyd using a number provided by Detective

Rufle.  *Id.* ¶ 11.  The parties dispute whether UC 137 and Plaintiff discussed exchanging sex for

money, or whether they merely discussed a paid arrangement for non-sexual companionship.  It is

undisputed, however, that Ms. Lloyd made an appointment for UC 137 to meet with a woman in the

apartment on East 64th Street where Ms. Lloyd worked the phones.  *Id.* ¶ 12.

---

[2] These officers, along with the City of New York, are at times referred to in this opinion as the "City Defendants."

A short time later, UC 137 arrived at the apartment.  Ms. Lloyd let him in.  *Id.* ¶ 14.  Soon thereafter, UC 137 signaled to the other members of the field team, likely by text message, that there was an agreement to exchange sex for money, although as noted, Plaintiff disputes that she ever entered into any such an agreement.  *Id.* ¶ 16.

Triggered by UC 137's signal, a number of officers entered the apartment to secure the undercover officer and make their arrests.  How the police entered the apartment, and what they did upon entry are the subject of material dispute.  The officers take the position that they knocked on the door, announced that they were police, and made numerous requests that the tenants of the apartment open the door.  Because no one opened the door voluntarily, the officers forcibly breached the door using a ram.  *Id.* ¶¶ 18-20.  As Sergeant Graves testified at his deposition "whoever was behind the door, refused to open . . . . We heard movement inside.  At that point our undercover's safety was in question" so he "instructed Detective Mills" to "breach the door" with a heavy breaching ram.  Deposition of Gregory Graves, annexed as Ex. C to Jacobs Decl., at 37:24-38:6.

Ms. Lloyd, on the other hand, asserts that the ramming began immediately, at the same time police announced themselves.  In her version of events, Ms. Lloyd told the officers repeatedly that she would open the door if they would only stop ramming it.  But the officers continued to ram the door until it broke.  Pl. City 56.1 ¶¶ 19-20.  Ms. Lloyd's account is supported by her deposition testimony.  There, she testified that she went to open the door to the apartment, and that "right before I opened the door, the door slammed, and they said, this is the police."  Deposition of Alyssa Lloyd, annexed as Ex. A to Declaration of Elissa B. Jacobs (Dkt. No. 87) at 141:15-17.  "They took the ram and they smashed the door" but Ms. Lloyd "kept saying, listen, I'm behind the door, there's not—not much room, if you want me to open it, you need to stop slamming the door."  *Id.* at 141:22-142:2.

As much as the parties dispute how the officers entered the apartment, they disagree about what happened afterward—particularly about where Ms. Lloyd and the undercover officer were at various times after the named officers entered the apartment.  According to Sergeant Graves, Ms. Lloyd obstructed him after he entered.  Sergeant Graves testified that after the officers breached the door and entered the apartment, "we encountered a female who was in the hallway in close proximity to the front door . . . ."  He "entered further with this female in front of me and observed in the back more movement of an unknown person in a back room."  Graves Dep. at 38:16-24.  "I was trying to make my way to the . . . back of the apartment" but the "[f]emale in front of me would not allow me to pass . . . ."  *Id.* at 39:12-17.  Sergeant Graves claims that he did not know where UC 137 was after he entered the apartment and was concerned about his safety, testifying that after his interaction with Ms. Lloyd, he "continue[d] on to the back room, at that time [I] did not know the location of the undercover."  *Id.* at 39:21-23.

Ms. Lloyd says that she knew the location of the undercover.  In her telling, UC 137 was standing near her, in plain sight of any officer entering:  Sergeant Graves must have seen UC 137 when he entered and known that he was safe.  Pl. City 56.1 ¶ 22.  She testified as much at her deposition.  She said that throughout the time officers were slamming on the door, UC 137 was "standing by the door, watching me . . .  Yelling at the people."  Lloyd Dep. at 142:7-10.  She has also submitted an affidavit stating that "UC 137 was standing near to me in plain sight of any officer entering the apartment" and that "Sergeant Graves must have seen UC 137 on entry to the apartment and known UC 137 was safe.  Indeed, Sergeant Graves rushed past UC 137 to reach me." Affidavit of Alyssa Lloyd (Dkt. No. 102) ("Lloyd Aff.") ¶¶ 7, 9.

Ms. Lloyd disputes Sergeant Graves' contention that she obstructed him as the officers entered the apartment.  Much to the contrary, she asserts in her response to the City Defendants' 56.1 statement, she "had stepped back and to the side, into the kitchen area beyond the hallway,

before the officers entered the apartment." Pl. City 56.1 ¶ 23. And in her deposition, Ms. Lloyd testified that when officers opened the door "I stepped away in the little hallway and my—they smashed the door." Lloyd Dep. at 142:11-14. Previous testimony by Ms. Lloyd pursuant to New York General Municipal Law § 50-H was consistent: When police were attempting to enter the apartment, she "stood in the kitchen with my hands up and waited for them to open the door" and that she "stayed in the kitchen area, hallway area, with my hands up waiting for them to open the door with the battering ram;" she "didn't want to be next to the door in case they hit me with it." 50-H Hearing, annexed as Ex. Q to Declaration of Ana Maria Vizzo (Dkt. No. 91), at 29:9-22; *see also* Lloyd Aff. ¶ 6.

It is undisputed, however, that after Sergeant Graves entered the apartment he pushed Ms. Lloyd's right arm. As a result, she fell to the ground, where she remained for approximately one minute. *Id.* ¶¶ 28-29. Ms. Lloyd asserts that the push injured her; it "caused a further rip in the stitches on the right side of my chest, aggravating the saline leakage from my right expander, which, in turn, further irritated my skin." Lloyd Aff. ¶ 11.[3]

After she was pushed down, Plaintiff told the officers repeatedly that she had cancer. She even showed them the bandaged area around her chest. Pl. City 56.1 ¶ 31. Now, for the first time, Sergeant Graves was aware of Ms. Lloyd's breast cancer diagnosis. *Id.* ¶ 32. Once the officers saw Ms. Lloyd's condition, they helped her up and put her on a bed. *Id.* ¶ 33. She was then placed under arrest. Ms. Lloyd did not know it yet, but she had been arrested for promotion of prostitution—a felony. *Id.* ¶ 34.

Ms. Lloyd was then handcuffed by an unidentified officer. *Id.* ¶ 35. The officers were now

---

[3] The City Defendants have taken the position that Ms. Lloyd has not claimed any injuries as a result of the push from Sergeant Greaves. *Id.* ¶ 30. This despite Ms. Lloyd's factual contentions and the allegations in her complaint.

aware of her medical condition.  As a result, rather than using one set of handcuffs to cuff her hands

behind her back, the officers used at least two sets of handcuffs.  The parties refer to that practice as

"double cuffing," and the Court will adopt the term.  *Id.* ¶ 36.  The Court presumes that double

cuffing allows an officer to link two sets of handcuffs in series, creating more space between an

arrestee's hands, and reducing the strain on her chest and shoulders when her arms are pulled

behind her back.  Whatever its palliative effect, from Ms. Lloyd's perspective, double cuffing was

not enough.  She protested even double cuffing behind her back because of her medical condition,

and asked that the officers handcuff her in front with single handcuffs.  *Id.* ¶¶ 235-36.  Ms. Lloyd

asserts that the rear double cuffing caused stitches on the right side of her chest to rip further,

aggravating the saline leakage from her right expander and further irritating her skin.  *Id.* ¶ 237.

### b.  The 19th Precinct

Officers transported Ms. Lloyd to the 19th Precinct station house.  There, the rear handcuffs

were removed, and she was secured by one wrist to a bench.  *Id.* ¶ 44.  Ms. Lloyd's purse was also

brought to the 19th Precinct.  It contained antibiotics and dressing changes to treat her chest.  *Id.*

¶ 242.  While waiting on the bench, Ms. Lloyd asked several officers if she could take her

medication, and also asked too if she could change her bandages.  *Id.* ¶ 45.  The officers told

Plaintiff to wait for her arresting officers.  *Id.* ¶ 46.

After her wait on the bench, officers again placed Ms. Lloyd in handcuffs, then escorted her

to the station's squad room to be interviewed.  *Id.* ¶ 48.  Two of her arresting officers, Detective

Mills and Detective Rufle, met Ms. Lloyd inside the squad room.  Detective Rufle removed Ms.

Lloyd's handcuffs "because she had an injury."  *Id.* ¶¶ 49-50.  Ms. Lloyd asked Detective Rufle to let

her take her medication.  Detective Rufle told Ms. Lloyd that he was unable to administer medicine

because he was not a doctor.  *Id.* ¶¶ 51-52.

It is undisputed that the detective also told her, however, that she could go to the hospital to

have her medication administered.  *Id.* ¶ 52.  It is also undisputed that Ms. Lloyd elected to continue being processed in her criminal proceeding, rather than go to the hospital to have her medication administered.  Check *Id.* ¶ 55.  But Ms. Lloyd asserts that she decided not to go to the hospital because she was told by the officers that a trip to the hospital would delay her criminal processing and her release from jail.  As Ms. Lloyd asserts in an affidavit, Detective Rufle told her a trip to the hospital would "delay my arraignment and release on my own recognizance on a misdemeanor charge, in time to make my surgery."  Lloyd Aff. ¶ 21; *accord* Lloyd Dep. at 161:7-9; 162:8-13.

Believing that she would be released on her own recognizance on a misdemeanor charge in time to make her scheduled surgery, Ms. Lloyd declined to visit the hospital and opted to continue with processing.  *Id.* ¶ 55.  She even signed a medical treatment of prisoner form, indicating her refusal to obtain medical treatment and go to the hospital, although Plaintiff again asserts that she did so in reliance on officers' false assurances that she would be released on her own recognizance on a misdemeanor charge in time to make her scheduled surgery.  *Id.* ¶ 56.

At some point during her time in the 19th Precinct, Ms. Lloyd explained to Detectives Rufle and Mills that she needed to change the dressing on her chest to stave off and limit infection.  *Id.* ¶ 247.  In response, Detective Mills allowed Plaintiff to use the restroom to "address something with her chest."  Ms. Lloyd replaced dressing on her chest, now soaked with saline, with sanitary napkins she found in the restroom.  *Id.* ¶ 249.  An officer also "snuck" her an antibiotic from her purse.  *Id.* ¶ 246.

### c.  Plaintiff's Arraignment

Late in the evening of September 20, 2013, Ms. Lloyd was again placed in rear double cuffs for transport from the 19th Precinct to Central Booking.  *Id.* ¶ 61.  Ms. Lloyd remained in rear double cuffs for three to five hours during the trip to Central Booking, and while she stood in line there.  *Id.* ¶ 252.  She complained repeatedly to Detectives Byrne and Mills about pain and

discomfort from the handcuffs.  But they ignored her complaints.  *Id.* ¶ 253.

The parties dispute whether Ms. Lloyd received treatment during her stop at Central Booking.  The officers assert that Ms. Lloyd was seen by EMS at Central Booking and refused to be treated.  *Id.* ¶ 64.  Ms. Lloyd rejects that version of events, and states in her affidavit that "[h]ad someone from EMS seen me, he or she would have removed the sanitary napkins from my chest and replaced them with a proper dressing."  Lloyd Aff. ¶ 31.  Ms. Lloyd asserts that the intake officer at Central Booking "refused to take" her because she had an open wound on her chest, telling Detectives Byrne and Mills that she needed to go to a hospital.  Pl. City 56.1 ¶ 254.  Instead, the detectives brought Ms. Lloyd to the 7th Precinct, to be held overnight until her arraignment.  *Id.* ¶¶ 65, 255.

On September 21, 2013, Ms. Lloyd was arraigned in New York City Criminal Court on charges of promoting prostitution in the third degree, a felony, and permitting prostitution, a misdemeanor.  *Id.* ¶ 257.  The presiding judge set bail at $10,000 bond or $5,000 cash.  Pl. Med. 56.1 ¶ 156.  The Court presumes that Ms. Lloyd was unable to meet those requirements for release, because later that day, she was transported again—this time to Rikers Island.

### d.  Rikers Island

Plaintiff was transferred to Rikers Island in the evening of September 21, 2013.  Pl. Med. *Id.* ¶ 157.  Early the next morning, a nurse evaluated Ms. Lloyd, taking her vitals and administering a series of tests.  *Id.* ¶ 158.  Later, Ms. Lloyd was seen by Dr. Mohammad Alam, M.D., who performed a "new admission" examination.  *Id.* ¶ 160.  Dr. Alam documented Ms. Lloyd's preexisting medical conditions and treatment, in particular her breast cancer diagnosis, chemotherapy, mastectomy, and reconstructive surgery.  *Id.* ¶¶ 161-62.  Ms. Lloyd told Dr. Alam that she was taking oral antibiotics and required daily dressing changes.  She also told the doctor that she had a follow-up procedure scheduled with Dr. Chang the following day.  *Id.* ¶¶ 163-64.

The parties dispute whether Dr. Alam examined Plaintiff's breasts.  *Id.* ¶¶ 168-69.  Dr. Alam cites to a portion of his deposition where he testified, when asked if Plaintiff "at any point pull[ed] up her shirt to show you what was underneath" that "I opened it and I looked at what is there." Deposition of Mohammed Alam, M.D. (annexed as Ex. T to Vizzo Decl.) at 38:9-13.  He also cites to his physical examination notes which reflect that he recorded that Ms. Lloyd had a suture in place on her right breast with redness around the tape site, and mild discharge on the dressing.  Vizzo Decl., Ex. E at 9.  On the other hand, Ms. Lloyd maintains that she lifted her shirt to show Dr. Alam "the sanitary napkins covering my chest, which by now were not only saline-soaked but also pus-filled" but that "Dr. Alam did not examine my chest."  Affidavit of Alyssa Lloyd (Dkt. No. 107) ("Lloyd Aff. 2") ¶¶ 17, 19.

Ms. Lloyd maintains that she "asked Dr. Alam for antibiotics and a dressing change *immediately*," but he did not do so, and that she did not "hear Dr. Alam ask or instruct" anyone to provide her with the same.  Lloyd Aff. 2 ¶¶ 20-22 (emphasis added).  But it is undisputed that during his examination and thereafter, Dr. Alam took a number of steps to provide future treatment for Ms. Lloyd.  Dr. Alam made referrals to Plastic Surgery and Oncology at Elmhurst Hospital.  Pl. Med. 56.1 ¶ 174.  He directed that Plaintiff's dressings be changed daily for seven days.  He prescribed a number of additional medications and treatments:  hydrocortisone cream for dermatitis of the right breast to be applied twice daily, and Librium as a replacement for Diazepam, which Plaintiff had been taking outside of jail for muscle spasms under her breasts.  *Id.* ¶ 175.  Dr. Alam realized that the antibiotic she had been taking prior to her arrest was not available in the facility's pharmacy.  *Id.* ¶ 171.  He prescribed a "STAT" dose of Keflex as an alternative antibiotic.  *Id.* ¶ 172. Ms. Lloyd does not dispute these facts, but points out that Dr. Alam did not electronically sign his notes until 3:46 p.m., which was several hours after he physically examined her.  Vizzo Decl., Ex. E at 12.

Plaintiff had no further contact with Dr. Alam.  Pl. Med. 56.1 ¶ 176.  Records indicate that

Dr. Henry Thurka, M.D., another doctor at the facility, changed Plaintiff's antibiotic from Keflex to

Augmentin shortly after Dr. Alam's consultation because Keflex was not available in the facility's

pharmacy.  *Id.* ¶ 177-178.  There is a dispute regarding whether Ms. Lloyd received her antibiotic on

September 22.  Records from Pyxis, a medication dispensing system, state that a dose of Augmentin

was distributed to Plaintiff at 10:12 p.m. on September 22, 2013.  *Id.* ¶ 179.  However, Plaintiff

maintains that she never received antibiotics at Rikers on Sunday, September 22, 2013.  Lloyd Aff. 2

¶ 27.  It is undisputed, however, that Ms. Lloyd received medical treatment, including the dressing

changes ordered by Dr. Alam, wound care, and antibiotics, on a daily basis throughout the rest of

her period of detention on Rikers Island.  *Id.* ¶¶ 181-83.

### e.  Release from Rikers Island

Ms. Lloyd was released from Rikers Island on September 26, 2013, six days after her arrest,

and three days after her originally scheduled surgery date.  *Id.* ¶ 193.  Five days after her release, on

October 1, 2013, Ms. Lloyd returned to Dr. Chang's office.  *Id.* ¶ 194.  Dr. Chang's notes

documented the reason Ms. Lloyd had missed her operation as "due to sudden death of relative."

*Id.*  Dr. Chang examined Ms. Lloyd and found that her surgical incision wound was in "breakdown"

and noted drainage in her right breast.  *Id.* ¶ 195.  During that visit, Dr. Chang deflated Ms. Lloyd's

right tissue expander.  *Id.* ¶ 197.  But she needed additional surgery.  On October 3, 3013, Ms. Lloyd

went to New York Hospital Queens for a procedure to remove her right tissue expander and

explore the reconstruction of her right breast.  *Id.* ¶ 198.  During the operation, Ms. Lloyd's right

breast was found to be infected, requiring that it be washed out with fluid and removal of the tissue

expander.  *Id.* ¶ 200.

Ms. Lloyd did not immediately pursue additional reconstructive surgery, in part because she

was to commence radiation therapy.  From December 2013 to May 2014, she received radiation

treatment. *Id.* ¶ 208. Since completing radiation, Dr. Chang has recommended that Ms. Lloyd reconstruct her right breast using tissue from other parts of her body. *Id.* ¶ 211. But as of May 31, 2016, Ms. Lloyd had not yet undertaken additional reconstruction surgery. *Id.* ¶ 213.

### B. Procedural History

The amended complaint in this matter was filed on May 14, 2015. Dkt. No. 15. On August 8, 2016, the parties entered into a Stipulation and Order of Dismissal, pursuant to which Plaintiff withdrew a number of claims asserted in the amended complaint, namely: false arrest under 42 U.S.C. § 1983 and under New York law, malicious prosecution under 42 U.S.C. § 1983 and under New York law, violation of the right to a fair trial under 42 U.S.C. § 1983, deliberate indifference to serious medical needs under New York law, negligent screening, hiring and retention under New York law, and negligent training and supervision under New York law. Dkt. No. 85.

Plaintiff also withdrew a number of claims to the extent they were asserted against Corizon Health, Inc. and Dr. Alam, and withdrew her claims under the Americans with Disabilities Act and Rehabilitation Act against all Defendants except the City of New York. *Id.* Finally, Plaintiff dismissed the following named defendants from this case: Achille Antoine, Yvette Avery-Hughes, Adrian Campos, Dominique Georges, Shalonda Gonzalez, Rachelle Hogans-Blair, Bernadette James, Cynthia Lallemand, Raquel Murphy, Esperance Ndayishimiye, Annie Panis, Lisa Polite, Sean Ryan, Undercover Officer C146, and Scott Velasquez. *Id.*

The remaining Defendants are the City of New York, Sergeant Gregory Graves, UC 137, Detectives James Rufle, Paul Byrne, and David Mills, Corizon Health, Inc. and Dr. Mohammad Alam. The remaining claims against the City Defendants are: deliberate indifference to serious medical needs under 42 U.S.C. § 1983, excessive force under 42 U.S.C. § 1983, failure to intervene under 42 U.S.C. § 1983, municipal liability under 42 U.S.C. § 1983, claims under the Americans with Disabilities Act and Rehabilitation Act of 1973, assault and battery under New York law, *respondeat*

*superior* liability under New York law, intentional infliction of emotional distress under New York law, negligent infliction of emotional distress under New York law, and negligence under New York law.

After entry of the stipulation and order, the remaining claims against Corizon Health, Inc. and Dr. Alam were:  deliberate indifference to serious medical needs under 42 U.S.C. § 1983, intentional infliction of emotional distress under New York law, and negligent infliction of emotional distress under New York law.  In Plaintiff's memorandum of law opposing the Medical Defendants' motion for summary judgment, however, Plaintiff stated that she "withdraws her Section 1983 claim against Corizon Health, Inc. and her claims under New York law against Corizon Health[,] Inc. and Dr. Alam."  Plaintiff's Memorandum of Law in Opposition to Medical Defendants' Motion for Summary Judgment (Dkt. No. 106) at 13.  Accordingly, the only remaining claim Plaintiff asserts against any of the defendants involved in the events that took place on Rikers Island is a claim for deliberate indifference to serious medical needs under § 1983, against Dr. Alam.

The City Defendants filed a motion for summary judgment on August 25, 2016 (Dkt. No. 93) ("City Def. Mem.") which Plaintiff opposed on September 26, 2016 (Dkt. No. 101) ("Pl. City Mem.").  Dr. Alam filed a motion for summary judgment on August 29, 2016 (Dkt. No. 97) ("Med. Def. Mem."), Plaintiff opposed that motion on September 26, 2016 (Dkt. No. 106) and Dr. Alam replied on October 11, 2016 (Dkt. No. 113).

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit

under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party

bears the burden of showing that it is entitled to summary judgment.  *See id.* at 256.

      In evaluating a motion for summary judgment, the Court must "resolve all ambiguities and

draw all permissible factual inferences in favor of the party against whom summary judgment is

sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ.*,

131 F.3d 305, 312 (2d Cir. 1997)).  "[O]nly admissible evidence need be considered by the trial court

in ruling on a motion for summary judgment." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582

F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)).  The

Court's job is not to "weigh the evidence or resolve issues of fact; it is confined to deciding whether

a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310

F.3d 243, 254 (2d Cir. 2002) (citing *Anderson*, 477 U.S. at 249).  "Summary judgment is improper if

there is any evidence in the record that could reasonably support a jury's verdict for the non-moving

party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citing *Pinto v. Allstate Ins. Co.*,

221 F.3d 394, 398 (2d Cir. 2000)).

## III.      DISCUSSION

### A.  Deliberate Indifference to Serious Medical Needs

      A claim of deliberate indifference to serious medical needs has typically been analyzed under

a two-pronged standard.  "The first requirement is objective:  'the alleged deprivation of adequate

medical care must be 'sufficiently serious.''" *Spavone v. New York State Dep't of Correctional Servs.*, 719

F.3d 127, 139 (2d Cir. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)).  "The

second requirement is subjective:  the charged officials must be subjectively reckless in their denial

of medical care." *Id.*  These claims, when brought by pretrial detainees "are governed by the Due

Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments

Clause of the Eighth Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).  This is because

"pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Id.* (citation and internal quotation marks omitted).

Prior to addressing the motions for summary judgment on Plaintiff's claims for deliberate indifference to serious medical needs, the Court will first review a recent change in the law applicable to such claims. In *Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009), the Second Circuit held that the "the standard for deliberate indifference is the same under the Due Process Clause of the Fourteenth Amendment as it is under the Eighth Amendment." *Id.* at 70; *see also id.* at 72 ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."). Consistent with that view, the Second Circuit held that to satisfy the second prong of a claim for deliberate indifference to serious medical needs, a pretrial detainee would be required to prove "that the government-employed defendant disregarded a risk of harm to the plaintiff *of which the defendant was aware.*" *Id.* at 71 (emphasis added); *see also Nielsen v. Rabin*, 746 F.3d 58, 64 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness . . . . This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result.") (quoting *Salahuddin*, 467 F.3d at 280).

Last month, however, the Second Circuit concluded that the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) "has undercut the reasoning in *Caiozzo.*" *Darnell*, 849 F.3d at 33. *Kingsley* examined whether, to prove an excessive force claim under the Fourteenth Amendment, "a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable." 135 S. Ct. at 2470 (emphasis in original). The Supreme Court concluded that "excessive force claims

brought under the Fourteenth Amendment do not require the same subjective intent standard as excessive force claims brought under the Eighth Amendment." *Darnell*, 849 F.3d at 33. The Second Circuit reasoned in *Darnell* that, "[f]ollowing the Supreme Court's analysis in *Kingsley*, there is no basis for the reasoning in *Caiozzo* that the subjective intent requirement for deliberate indifference claims under the Eighth Amendment . . . must apply to deliberate indifference claims under the Fourteenth Amendment." *Id.* at 33-34. The Second Circuit therefore overruled *Caiozzo* "to the extent that it determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is under the Eighth Amendment." *Id.* at 35.

Observing that the "subjective prong" of a deliberate indifference claim is "perhaps better classified as a '*mens rea* prong' or 'mental element prong,'" *id.* at 29, in *Darnell* the court of appeals instructed, in light of *Kingsley*, that a "pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. After *Darnell*, "deliberate indifference" is now "defined objectively," and the "Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.*

The reasoning of *Darnell* applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment. *Darnell* involved claims of deliberate indifference in the context of a challenge to conditions of confinement. However, as the Second Circuit noted there, *Caiozzo*, the case which *Darnell* overruled in part

> involved a claim for deliberate indifference to medial needs under the Fourteenth Amendment. Nevertheless, the Court's interpretation of 'deliberate indifference' applied to any pretrial detainee claim for deliberate indifference to 'serious threat to . . . health or safety'—such as from unconstitutional conditions of confinement, or the failure-to-protect—because deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment.

*Id.* at 33, n.9 (quoting *Caiozzo*, 581 F.3d at 68, 72).  The Court therefore reads *Darnell* to require that the "*mens rea* prong" of deliberate indifference to serious medical needs claims under the Fourteenth Amendment be analyzed objectively:  rather than ask whether the charged official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety," courts are to instead determine whether the official "knew, or should have known" that his or her conduct "posed an excessive risk to health or safety."  *Id.* at 33, 35.

### 1.  City Defendants

The City Defendants do not contest that the asserted deprivation in this case was "sufficiently serious," only that the officers did not act with the requisite *mens rea*.  City Def. Mem. at 6.  Applying the standard clarified by the Second Circuit in *Darnell* to the facts of this case, the City Defendants are entitled to summary judgment on Plaintiff's claim of deliberate indifference to her serious medical needs, because Plaintiff cannot show that they knew or should have known that their acts or omissions posed an excessive risk to her health or safety.

A reasonable jury could not find that the City Defendants were deliberately indifferent to Plaintiff's serious medical needs, because they repeatedly offered her medical assistance.  The undisputed facts show that on numerous occasions, the officers involved in Plaintiff's arrest and detention prior to her transfer to Rikers Island gave her the option to be taken to the hospital to take her antibiotics and to change her dressings.  On each occasion, Plaintiff refused.

Plaintiff concedes that she refused the offers made to her.  However, she takes the position that, notwithstanding her decision to continue with her post-arrest processing rather than visit the hospital, the City Defendants were deliberately indifferent because they falsely assured her that she would be released on her own recognizance on a misdemeanor charge, in time to make her scheduled surgery.  Pl. City Mem. at 8.  Plaintiff maintains that, absent these "false assurances," she would have chosen to go to the hospital.  *Id.*

Plaintiff's assertions do not permit a reasonable jury to conclude that the officers were deliberately indifferent to her medical needs.  Plaintiff concedes that officers provided her with the ability to visit the hospital to secure healthcare for her condition.  Her complaint, therefore, is not that officers were deliberately indifferent to her medical needs; rather that officers provided her inaccurate information about the likely disposition of her criminal case.  Based upon the evidence in the record, however, a reasonable jury could not conclude that the officers "knew, or should have known" that their provision of information to Plaintiff about her criminal case "posed an excessive risk" to Plaintiff's "health or safety," even assuming that the information they provided to Plaintiff about the likely disposition of her criminal case was incorrect—they offered her treatment, which she refused.  *Darnell*, 849 F.3d at 36.

The facts of this case are materially different from those in *Hathaway v. Coughlin*, 37 F.3d 63 (2d Cir. 1994), the principal case on which Plaintiff relies.  In *Hathaway*, the Second Circuit concluded that a rational jury could find the defendant was deliberately indifferent to the plaintiff's medical needs where the defendant failed to inform the plaintiff, over a period of more than two years, that the plaintiff had two broken pins in his hip.  37 F.3d at 65.  The Second Circuit reasoned that the plaintiff's failure to request surgery during that time period was "understandable, given that crucial information bearing on his condition was never disclosed to him," because the "presence of broken pins in a hip is information that would give most people pause to consider surgery."  *Id.* at 67-68.  Here, by contrast, Plaintiff was aware of her condition, and the City Defendants did not withhold or misrepresent information bearing upon her medical condition as in *Hathaway*.  Unlike in *Hathaway*, the City Defendants were not responsible for, and did not contribute to, any ignorance on Plaintiff's part of her own condition or the need for treatment.  Indeed, the City Defendants provided Plaintiff with the opportunity to go to the hospital to obtain treatment after learning of her medical condition.  Summary judgment is granted to the City Defendants on Plaintiff's claim of

deliberate indifference to serious medical needs.

### 2. Dr. Alam

Dr. Alam, the Rikers Island physician who treated Plaintiff on one occasion, when he performed her new admission examination, also seeks summary judgment on Plaintiff's claim of deliberate indifference to serious medical needs.  First, he argues that Plaintiff's asserted deprivation of medical care was not sufficiently serious to prove such a claim.  Second, Dr. Alam asserts that even if Plaintiff could show that the asserted deprivation was sufficiently serious, he did not act with the state of mind necessary to prove this claim.  Med. Def. Mem. at 12, 18.  The Court concludes that summary judgment in Dr. Alam's favor is warranted because a reasonable jury could not conclude that Dr. Alam acted with the requisite state of mind.

In this case, Plaintiff asserts that Dr. Alam did not immediately provide her with antibiotics or a dressing change, or examine her chest, on September 22, 2013.  It is undisputed, however, that Dr. Alam prescribed Keflex as an alternative antibiotic to Cefadroxil, made plastic surgery and oncology referrals, and ordered daily wound care.  It is also undisputed that Plaintiff had no further contact with Dr. Alam after her new admission examination, and that she received antibiotics and wound care on a daily basis during the remainder of her detention at Rikers Island.  Based upon the evidence in the record, a reasonable jury could not conclude that Dr. Alam "knew or should have known" that his actions or omissions pertaining to a single examination of Plaintiff "posed an excessive risk to [her] health or safety."  *Darnell*, 849 F.3d at 35.

Moreover, Plaintiff does not assert that she was deprived of treatment, only that her treatment was delayed by one day.  This delay does not support the inference that Dr. Alam was deliberately indifferent to her medical needs.  Assuming the delay was in any way attributable to Dr. Alam, this amounts to negligent conduct at most, and "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim."  *Chance v. Armstrong*, 143 F.3d

698, 703 (2d Cir. 1998).  Summary judgment is granted to Dr. Alam on Plaintiff's claim for deliberate indifference to serious medical needs.

### B. Excessive Force

Plaintiff brings excessive force claims against the City Defendants based upon two principal incidents.  First, she argues that Sergeant Graves used unconstitutional excessive force when he pushed her to the ground after officers entered the apartment where UC 137 came to meet K.B., and that UC 137 failed to intervene to prevent this use of force.  Second, she argues that Detectives Mills and Byrne's use of rear double handcuffs to restrain her subsequent to her arrest and prior to her transfer to Rikers Island was also an unconstitutional use of excessive force.  Because both claims involve disputed issues of material fact relevant to a determination of whether the officers' conduct was reasonable, the Court denies Sergeant Graves, Detective Mills, and Detective Byrne's motions for summary judgment; however, UC 137's motion for summary judgment on Plaintiff's failure to intervene claim will be granted.

"The Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive is to be analyzed under that Amendment's 'reasonableness' standard."  *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (internal quotation marks omitted).  To determine whether the force used in a given arrest is reasonable, courts pay "careful attention to the facts and circumstances of each particular case," and judge the "reasonableness" of the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* (quoting *Graham v. Connor*, 490 U.S. at 396).

It is "well established that law enforcement officers violate the Fourth Amendment if the amount of force they use is 'objectively unreasonable' in light of the facts and circumstances confronting them."  *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (citation omitted).

Further,

> [t]he calculus of reasonableness must embody allowance for the fact that police
> officers are often forced to make split-second judgments—in circumstances that
> are tense, uncertain, and rapidly evolving—about the amount of force that is
> necessary in a particular situation.

*Id.* (quoting *Graham*, 490 U.S. at 396-97); *accord Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006).

"The 'reasonableness' of the amount of force used thus 'must be judged from the perspective of a reasonable officer on the scene . . . at the moment' the force is used." *Rogoz*, 796 F.3d at 246-47 (quoting *Graham*, 490 U.S. at 396). "In sum, the 'standard' to be applied in determining whether 'the amount of force' used exceeded the amount that was 'necessary' in the particular circumstances is 'reasonableness at the moment.'" *Id.* at 247 (quoting *Graham*, 490 U.S. at 396, 397). Furthermore, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396.

### 1. Excessive Force Claim Against Sergeant Graves

There is no dispute that Sergeant Graves pushed Plaintiff to the ground after he entered the apartment. The only question is whether this use of force was excessive under the Fourth Amendment. Sergeant Graves argues that he is entitled to summary judgment on this claim because his use of force was "objectively reasonable." City Def. Mem. at 10. In opposition, Plaintiff maintains that there are disputes "as to the material facts surrounding the circumstances of the push" and that while the City Defendants suggest that Plaintiff refused to open the door to the apartment and that she was blocking access to the back room when officers entered, she actually did offer to open the door, was standing near to UC 137 "in plain sight of any officer entering the apartment," and was "standing to one side, giving Sergeant Graves unimpeded access" to the back room. Pl. City Mem. at 12. Plaintiff also cites record evidence indicating that she had her hands up in the air when officers entered the apartment, *see id.*, and that the push to the ground exacerbated the saline leakage from her right breast expander, increasing the irritation to her skin. *Id.* at 13.

Sergeant Graves argues that the push at issue was a non-actionable *de minimis* use of force and that summary judgment is appropriate on this basis alone.  City Def. Mem. at 10.  It is not entirely clear whether he intends to argue that Plaintiff's asserted injury from this use of force was *de minimis*, or that the amount of force he employed was *de minimis*.  As to Plaintiff's asserted injury, Sergeant Graves' argument must be rejected.  Sergeant Graves is correct that some courts require a plaintiff asserting a Fourth Amendment excessive force claim to show a greater than *de minimis* injury.  *See, e.g.*, *Marlin v. City of New York*, No. 15-cv-2235 (CM), 2016 WL 4939371, at *12 (S.D.N.Y. Sept. 7, 2016) ("*De minimis* injuries will not usually sustain a claim of excessive force.").  However, in this case, he does not dispute that the push, which knocked Plaintiff to the ground, caused a further rip in her stitches and aggravated the saline leak in her right expander, which are certainly greater than *de minimis* injuries.

The essence of Sergeant Graves' argument about the *amount* of force he used is that the amount of force used in a particular incident can be deemed *de minimis* as a matter of law, regardless of the surrounding circumstances.  This contention is inconsistent with the standard applicable to Fourth Amendment excessive force claims.  As has been discussed, the reasonableness of a use of force is evaluated in light of the facts and circumstances facing the officer at the scene.  *See, e.g.*, *Adedeji v. Hoder*, 935 F. Supp. 2d 557, 566 (E.D.N.Y. Mar. 27, 2013) ("[Defendant's] claim rests on the premise that there exists a threshold of force or injury below which, irrespective of the surrounding circumstances, an officers' force is reasonable as a matter of law.  This approach to the question of excessive force, however, misunderstands the Fourth Amendment analysis.").

The Court concludes that there are disputed issues of material fact that preclude a grant of summary judgment to Sergeant Graves.  As noted, the reasonableness of the use of force is to be judged in light of the facts and circumstances with which an officer is presented.  And here, there are numerous disputes concerning what the circumstances confronting Sergeant Graves were,

including:  whether Plaintiff was compliant with officers' requests that she open the apartment door, whether UC 137 was visible to Sergeant Graves as he entered the apartment, and whether Plaintiff was in Sergeant Graves' way or whether she was standing to the side with her hands raised.  Were a jury to credit Plaintiff's version of events, it could reasonably conclude that when Sergeant Graves pushed Plaintiff to the ground, he used an objectively unreasonable amount of force.  *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) ("Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable.").

### 2.   Qualified Immunity for Sergeant Graves

Sergeant Graves argues that, even if summary judgment is precluded on Plaintiff's excessive force claim against him, he is nevertheless entitled to qualified immunity on this claim.  City Def. Mem. at 12.  Because summary judgment on qualified immunity grounds is inappropriate where there are disputed issues of fact pertinent to a determination of the reasonableness of an officer's conduct, however, Sergeant Graves' motion for summary judgment on this basis must be denied.

Police officers are entitled to qualified immunity in § 1983 suits brought against them in their individual capacities if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Second Circuit has explained that "[e]ven where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)); *see also Weyant v. Okst*, 101 F.3d 845, 857 (2d Cir. 1996) ("[P]ublic officials are entitled to qualified immunity if (1) their conduct does not violate

clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their

acts did not violate those rights."). "The objective reasonableness test is met—and the defendant is

entitled to qualified immunity—if 'officers of reasonable competence could disagree' on the legality

of the defendant's actions." *Lennon*, 66 F.3d at 420 (quoting *Malley v. Briggs*, 475 U.S. 335, 340-41

(1986)).

> The Second Circuit has held that when
>
> > the factual record is not in serious dispute . . . [,] [t]he ultimate legal determination
> > whether . . . a reasonable police officer should have known he acted unlawfully is
> > a question of law better left for the court to decide.

*Lennon*, 66 F.3d at 421 (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)); *accord Harris v.*

*O'Hare*, 770 F.3d 224, 239 (2d Cir. 2014) (same); *Estate of Jaquez v. City of New York*, 104 F. Supp. 3d

414, 434 (S.D.N.Y. 2015) (question of whether a "reasonable police officer should have known he

acted unlawfully" is a question of law for the court "[e]ven though a reasonableness inquiry

traditionally is a question of fact for the jury"). Conversely, "summary judgment on qualified

immunity grounds is not appropriate when there are facts in dispute that are material to a

determination of reasonableness." *Husain v. Springer*, 494 F.3d 108, 133 (2d Cir. 2007) (quoting

*Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)).

The Court cannot conclude that Sergeant Graves is entitled to qualified immunity at this

stage of the litigation because facts material to a determination of the reasonableness of his actions

are in dispute. Given the disputed issues of material fact surrounding the circumstances of Sergeant

Graves' use of force against Plaintiff that bear on the objective reasonableness of his conduct, his

request for summary judgment on this ground must be denied.

### 3.   Failure to Intervene Claim Against UC 137

UC 137 seeks dismissal of Plaintiff's claim that he failed to intervene to prevent Sergeant

Graves' use of excessive force against her. Because Plaintiff's version of events, if credited,

demonstrates that UC 137 did not have a realistic opportunity to prevent that use of force, his motion for summary judgment is granted.

"A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (citation omitted). However, "[i]n order for a law enforcement officer to be held liable for another officers' use of excessive force, 'there must have been a realistic opportunity [for the former] to intervene to prevent the harm from occurring.'" *Rogoz*, 796 F.3d at 251 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

Crediting Plaintiff's telling of the relevant events, the scene unfolded quickly and UC 137 had no opportunity to intervene to stop Sergeant Graves. As Plaintiff states in her affidavit, "Sergeant Graves rushed past UC 137 to reach me." Lloyd Aff. ¶ 9. To be sure, she also states that "UC 137 was standing near to me." *Id.* ¶ 7. But the fact that UC 137 was standing near Plaintiff when Sergeant Graves rushed past him and pushed Plaintiff does not constitute sufficient evidence for a reasonable jury to conclude that UC 137 had a realistic opportunity to prevent Sergeant Graves from pushing Plaintiff to the ground. *Cf. Scalpi v. Town of East Fishkill*, No. 14-cv-2126 (KMK), 2016 WL 858944, at *14 (S.D.N.Y. Feb. 29, 2016) (no realistic opportunity to intervene where use of force occurred quickly). Accordingly, summary judgment is granted to UC 137 on Plaintiff's failure to intervene claim against him.

### C. Excessive Force Claim Based Upon Rear Double Handcuffing

#### 1. Liability

"[M]erely handcuffing a suspect and requiring her to place her hands behind her back is not a constitutional violation." *Washpon v. Parr*, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008). However, "[c]ourts have found that handcuffing can give rise to a § 1983 excessive force claim where plaintiff

suffers injury as a result." *Usavage v. Port Auth. of N.Y. and N.J.*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013) (quoting *Gonzalez v. City of New York*, No. 98-cv-3084, 2000 WL 516682, at *4 (E.D.N.Y. Mar. 7, 2000)). "[I]n evaluating the reasonableness of handcuffing" courts typically consider "evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Case v. City of New York*, --- F. Supp. 3d ----, 2017 WL 571530, at *7 (S.D.N.Y. Feb. 10, 2017) (quoting *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. June 13, 2008)).

Most excessive force claims based upon the use of handcuffs in this Circuit are a "variation on . . . [a] familiar theme" of handcuffs that are alleged to be excessively tight and which cause injury to the arrestee as a result of their tightness. *Usavage*, 932 F. Supp. 2d at 594. This case, however, is not a variation on that theme. Plaintiff does not complain of excessively tight handcuffs, but rather, that the use of rear handcuffing as a method of restraint ripped stitches in her chest, causing significant injury.

"Courts in this Circuit have generally found that handcuffing does not suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or bruising." *Omor v. City of New York*, No. 13-cv-2439 (RA), 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27, 2015). In this case, Plaintiff has submitted an affidavit stating that the "rear double cuffs were too tight and too heavy, causing my stitches to rip even more, aggravating the saline leakage from my right expander, and further irritating my skin." Lloyd Aff. ¶ 17. This injury was more than just temporary discomfort or bruising.

The record evidence reflects that Plaintiff remained in rear double cuffs for three to five hours while en route to and while waiting in line at Central Booking. She also attests in her affidavit that she "repeatedly complained to Detectives Byrne and Mills about the pain and discomfort from the rear double-cuffing, to no avail." *Id.* ¶ 30. A reasonable jury could find that this extended

period of handcuffing for an arrestee who had not shown a propensity for violence, in view of

Plaintiff's condition and the injuries Plaintiff claims that rear handcuffing caused, was not an

objectively reasonable amount of force under the circumstances.  Summary judgment is

inappropriate on this claim.

### 2.  Qualified Immunity

The City Defendants argue that nonetheless, they are entitled to qualified immunity on this

claim and that summary judgment should be granted to them on that basis.  City Def. Mem. at 13-

14.  However, because there are unresolved facts that bear upon the reasonableness of the officers'

conduct regarding the use of rear double handcuffs, summary judgment on qualified immunity

grounds is inappropriate.

There are unresolved factual questions concerning what Detectives Mills and Byrne knew

regarding the effect the rear handcuffing was having on Plaintiff's physical condition.  These facts

bear on the reasonableness of their conduct and preclude a grant of summary judgment on qualified

immunity grounds.  As already noted, Plaintiff attests in her affidavit that she repeatedly complained

to them about the pain and discomfort from the rear cuffing.  She also cites testimony from her

deposition suggesting that, during the period of three to five hours in which she was rear cuffed, the

saline leak on her chest was visibly worsening and that the two officers were aware of her

deteriorating condition but did not remove the handcuffs or place her in front handcuffs.  Lloyd

Dep. at 98:16-23, 173:14-21.  The City Defendants' submissions are silent on the issue of what the

officers knew, if anything, about whether or not the rear handcuffing was exacerbating Plaintiff's

condition.  Given the facts presented to the Court, the Court cannot conclude as a matter of law at

this time that Detectives Mills and Byrne acted in an objectively reasonable manner.  Ultimately,

therefore, summary judgment on qualified immunity grounds is not appropriate because there are

unresolved facts that are material to a determination of the reasonableness of the officers' conduct.

The City Defendants cite to *Shen v. City of New York*, No. 14-cv-7358 (KBF), 2016 WL 4126541 (S.D.N.Y. Aug. 2, 2016) in support of their position that the officers are entitled to qualified immunity on Plaintiff's handcuffing claim.  In that case, the plaintiff brought a claim of excessive force because his arresting officers "placed him in rear [double] handcuffs even though they knew he had injured his right arm or shoulder." *Id.* at *8.  The court in that case noted that, even though the plaintiff "complained of his arm being broken and being in pain both before and after he was arrested," there was no evidence in the record indicating that "*after* plaintiff was handcuffed, he told the officers that the double-linked cuffs *exacerbated* his arm pain." *Id.* (emphasis in original).  According to the court, "[t]hat the officers accommodated plaintiff's medical injury to his arm vitiates in favor of reasonableness" and "unquestionably demonstrates that the officers were attempting to alleviate plaintiff's injury." *Id.* at *9.  Further, there was no record evidence demonstrating "that the officers who had handcuffed plaintiff had reason to know that their *accommodation* led to an unreasonable exacerbation of" the plaintiff's injury. *Id.*  Ultimately, the court concluded that the officers were entitled to qualified immunity on this claim because "[b]ased on the record evidence, it is clear that the officers used two sets of handcuffs to attempt to minimize the impact of the cuffing on plaintiff's injury" and that just because "their efforts nevertheless resulted in some discomfort to plaintiff does not save plaintiff's claim, as it is not 'obvious that no reasonably competent officer would have concluded' the amount of force used in handcuffing plaintiff by using an accommodation of double-linked cuffs violated the law." *Id.* (quoting *Malley*, 475 U.S. at 341).

Here, unlike in *Shen*, Plaintiff has cited to record evidence indicating not only that she complained to officers about the rear double cuffing, but also to evidence suggesting that officers were aware that the rear cuffing was exacerbating her pre-existing injuries.  The reasoning of *Shen*, therefore, does not provide a basis for the Court to conclude that Detectives Mills and Byrne are entitled to qualified immunity on this claim.  If anything, *Shen* supports the notion that officers'

awareness of whether the use of handcuffs is exacerbating an existing injury bears on the reasonableness of the officers' conduct for qualified immunity purposes.

### 3.   Personal Involvement of Remaining Officers

Plaintiff's handcuffing claim against the other officers, namely Sergeant Graves, Detective Rufle, and UC 137, must be dismissed.  The "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quotation marks omitted)).  Because Plaintiff has only presented evidence regarding the personal involvement of Detectives Mills and Byrne in the relevant events, summary judgment to the remaining officers is appropriate on this claim.

### D.  Americans with Disabilities Act and Rehabilitation Act

Plaintiff brings claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act against the City of New York based upon the use of rear double handcuffs during her detention by N.Y.P.D. officers.  Because the success of these claims depends upon whether officers reasonably accommodated Plaintiff's disability, and facts material to this determination are in dispute, the City's motion for summary judgment is denied.

Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Under the ADA, the term "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment."  42 U.S.C. § 12101(1). "Likewise, under Section 504 [of the Rehabilitation Act], '[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'"  *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (quoting 29 U.S.C. § 794(a)).

"Because the standards adopted by the two statutes are nearly identical, [courts] consider the merits of these claims together."  *Id.* (quoting *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (internal quotation marks omitted)).  "To establish a violation under Section 504 or Title II, a plaintiff must demonstrate that '(1) he is a qualified individual with a disability; (2) the defendant is subject to one of the Acts; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of h[er] disability.'"  *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 196 (2d Cir. 2014) (quoting *McElwee*, 700 F.3d at 640).

The City does not contest the first two elements of the test applicable to Plaintiff's ADA and Rehabilitation Act claims.  The City seeks summary judgment on these claims only on the basis that Plaintiff "has not identified any 'service, program, or activity' from which she was excluded" and that officers "worked to minimize the impact of the handcuffs by placing her in double handcuffs and releasing her from those restraints whenever practicable."  City Def. Mem. at 15.

The City's first argument, regarding whether Plaintiff has properly identified a "service, program, or activity," must be rejected.  "In the context of arrests, courts have recognized claims alleging a failure to provide reasonable accommodations where police execute a proper arrest but fail to reasonably accommodate a plaintiff's disability during the investigation or arrest, causing h[er] to suffer great injury or indignity than other arrestees."  *Wagner v. City of New York*, No. 14-cv-2521 (VEC), 2015 WL 5707326, at *7 (S.D.N.Y. Sept. 28, 2015) (citations and internal quotation marks omitted); *see also Sayers v. City of New York*, No. 04-cv-3907 (CPS), 2007 WL 914581, at *8 (E.D.N.Y. Mar. 23, 2007) ("Courts have recognized that the disability statutes apply to prisoners who are

transported.") (citing cases).

The City's second argument, regarding the officers' attempt to accommodate Plaintiff's disability, must also be rejected.  "The hallmark of a reasonable accommodation is effectiveness." *Dean v. Univ. at Buffalo Sch. Of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015). "Determining the reasonableness of an accommodation is a fact-specific question that often must be resolved by a factfinder." *Wright v. New York State Dep't of Corrections*, 831 F.3d 64, 72-73 (2d Cir. 2016) (citation, internal quotation marks and brackets omitted).  And "[a] defendant is entitled to summary judgment only if the undisputed record reveals that the plaintiff was accorded a plainly reasonable accommodation." *Id.* (quoting *Dean*, 804 F.3d at 189) (internal quotation marks omitted).

In this case, the Court cannot conclude as a matter of law that the officers' use of more than one set of handcuffs and their removal of the handcuffs at various points during Plaintiff's detention was a reasonable accommodation.  As discussed above in connection with Plaintiff's excessive force claim based on rear double handcuffing, a jury could conclude that the officers' use of rear double handcuffs for three to five hours was not reasonable.  For the same reasons discussed in that context, a reasonable jury could conclude that the City failed to offer a reasonable accommodation to Plaintiff within the meaning of the ADA and the Rehabilitation Act.  The City's motion for summary judgment on Plaintiff's ADA and Rehabilitation Act claims is denied.

### E.  Municipal Liability for the Use of Rear Double Handcuffs

Plaintiff contends that a municipal policy of the City of New York—the rear handcuffing of all arrestees irrespective of their physical conditions—was the moving force behind the use of excessive force against her.  Pl. City Mem. at 19.  Plaintiff's claim for municipal liability against the City may proceed to trial because she has raised a triable issue of fact regarding the existence of a municipal policy which caused her asserted constitutional injury.

"To hold a city liable under § 1983 for the unconstitutional actions of its employees, a

32

plaintiff is required to plead and prove three elements:  (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks and alterations omitted); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  Accordingly, "a municipality cannot be made liable [under § 1983] by application of the doctrine of *respondeat superior*," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986), but rather the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (internal quotation marks omitted).

A plaintiff may satisfy the "policy or custom" prong in one of four ways:  by proving the existence of (1) a formal policy, *see Monell*, 436 U.S. at 690; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights, *see Pembaur*, 475 U.S. at 483-84; (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policymakers, *see Monell*, 436 U.S. at 690-91; or (4) a failure to properly train or supervise municipal employees that amounts to "deliberate indifference to the rights of those with whom municipal employees will come into contact."  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996).

The City seeks summary judgment on this claim on the ground that a "single incident of unconstitutional activity, by itself, is insufficient to prove" municipal liability.  City Def. Mem. at 16-17.  The "single incident" principle the City invokes is inapplicable, however, because that rule applies where a plaintiff attempts to establish the *existence* of a municipal policy through evidence of a single incident of unconstitutional activity.  *See Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("[A] single incident . . . does not suffice to show a municipal policy.").  But that is not what Plaintiff is attempting to do here.  Instead, Plaintiff relies on the deposition testimony of Sergeant Graves, in which he testified that the City maintains a policy of rear handcuffing all

arrestees regardless of their physical condition.  Sergeant Graves testified as follows:

> Q:  Detective, have you ever arrested somebody without handcuffing him or her?
>
> A:  No, I have not.
>
> Q:  Detective, what if somebody had a broken arm, you arrested somebody with a broken arm, would you handcuff that person?
>
> Ms. Jacobs:  Objection.  You can answer.
>
> A:  Every situation is different, but in some way, shape or form, our policy is all prisoners are handcuffed to the rear.
>
> Q:  Irrespective of their physical condition?
>
> Ms. Jacobs:  Objection.  You can answer.
>
> A:  We take all conditions into account, but again, the policy is all prisoners are handcuffed to the rear.
>
> Q.  What if somebody had a broken wrist, would you handcuff that person?
>
> Ms. Jacobs:  Objection.
>
> A:  Again, policy is we will handcuff to the rear.  All situations, which are infinite, will be–are dealt with on a case-by-case basis.

Graves Dep. at 44:7-45:3.  Sergeant Graves' deposition testimony clearly raises a triable issue of fact with respect to the existence of a municipal policy that caused Plaintiff's asserted constitutional injury.

Of course, in order to prevail on her municipal liability claim at trial, Plaintiff will first need to prove that Detectives Mills and Byrne used unconstitutional excessive force through the use of rear double handcuffs, inasmuch as an underlying constitutional violation is a prerequisite to municipal liability.  *See, e.g.*, *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) ("[None] of our cases authorize[ ] the award of damages against a municipal corporation based on the actions of one of its officers . . . [i]f a person has suffered no constitutional injury . . . ."); *Segal v. City of New York.*, 459 F.3d 207, 219 (2d Cir. 2006) (where "district court properly found no underlying constitutional violation," it was not necessary to consider claims of municipal liability under *Monell* ); *Levy v. Alfano*,

47 F. Supp. 2d 488, 498 (S.D.N.Y. 1999) ("It is well settled that a municipality may not be held liable where there is no underlying constitutional violation by a municipal official.") (citation omitted).

### F.   State Law Assault and Battery

The City Defendants seek summary judgment on Plaintiff's state law assault and battery claims on the ground that this claim "is identical to his [sic] excessive force claim." City Def. Mem. at 8, n.4. The City Defendants are correct that "with the exception of the state actor requirement, the elements of a Section 1983 excessive force claim and state law assault and battery claims are substantially identical." *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 398 (S.D.N.Y. 2013) (citing *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir. 1991); *see also Kramer v. City of New York*, no. 04-cv-106 (HB), 2004 WL 2429811, at *11 (S.D.N.Y. Nov. 1, 2004) ("In the context of state officers performing their lawful duties, New York State law regarding assault and battery parallels the federal laws regarding excessive force."). But because Plaintiff's excessive force claims based upon the pushing and handcuffing incidents must be decided by a jury, so too must her state law assault and battery claims. *Cf. Castro v. County of Nassau*, 739 F. Supp. 2d 153, 178 n.17 (E.D.N.Y. 2010) (denying summary judgment on state law assault and battery claims where summary judgment was denied on § 1983 excessive force claim because "the same standard applies"). As a result, summary judgment on Plaintiff's state law assault and battery claims is also denied for Sergeant Graves as to the pushing incident, and denied for Detectives Mills and Byrne as to the use of rear double handcuffs.

### G.   State Law Intentional Infliction of Emotional Distress

Damages for intentional infliction of emotional distress are available under New York law where a defendant engages in "extreme and outrageous conduct, which so transcends the bounds of decency so as to be regarded as atrocious and intolerable in a civilized society." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 157 (2d Cir. 2014) (quoting *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135,

143 (1985) (quotation marks omitted)).  "To prevail on such a claim, a plaintiff must establish that there was 'extreme and outrageous conduct,' that the conduct was undertaken with 'intent to cause, or disregard of a substantial probability of causing, severe emotional distress,' and that the conduct did in fact cause severe emotional distress." *Id.* at 157-58 (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993)); *see also Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) ("Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress.").  "Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." *Stuto*, 164 F.3d at 827.

Moreover, intentional infliction of emotional distress is a "highly disfavored [tort] under New York law," *Turley*, 774 F.3d at 158 (quoting *Nevin v. Citibank, N.A.*, 107 F. Supp. 2d 333, 345-46 (S.D.N.Y. 2000)), and it "is to be invoked only as a last resort." *Id.* (quoting *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 256 A.D.2d 269, 270 (1st Dep't 1998)).  "[U]nder New York law, an intentional infliction tort may 'be invoked only as a last resort . . . to provide relief in those circumstances where traditional theories of recovery do not.'" *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (internal citations omitted).

In this case, Plaintiff bases her claim on the contention that Detectives Byrne, Mills, and Rufle "refus[ed] medical treatment to an arrestee with a post-surgery open wound" and that this constituted "extreme and outrageous" conduct.  Pl. City Mem. at 24.  But as discussed above, these officers did not in fact refuse medical treatment to Plaintiff; rather, they presented her with numerous opportunities to visit the hospital to have her medication administered and to change her dressings, all of which Plaintiff refused.  Given this faulty factual premise, and without needing to

decide whether an actual refusal to provide medical treatment could constitute extreme and

outrageous conduct, Plaintiff's intentional infliction of emotional distress claim fails.  In addition,

Plaintiff has not shown the unavailability of traditional theories of tort recovery, so invocation of

this "last resort" cause of action is not appropriate.  Summary judgment is granted to the City

Defendants on this claim.

### H.  State Law Negligent Infliction of Emotional Distress

"Under New York law, a plaintiff may establish [a claim for negligent infliction of emotional

distress] in one of two ways: (1) the 'bystander' theory; or (2) the 'direct duty theory.'"  *Baker v.*

*Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (quoting *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir.

1996)).  The "bystander theory" is obviously inapplicable in this case, as it provides that

> a defendant's conduct is negligent as creating an unreasonable risk of bodily harm
> to a plaintiff and such conduct is a substantial factor in bringing about injuries to
> the plaintiff in consequence of shock or fright resulting from his or her
> contemporaneous observation of serious physical injury or death inflicted by the
> defendant's conduct on a member of the plaintiff's immediate family in his or her
> presence.

*Id.* (quoting *Bovsun v. Sanperi*, 61 N.Y.2d 219, 224 (1984)).  Under the "direct duty" theory, "a

plaintiff suffers emotional distress caused by defendant's breach of a duty which unreasonably

endangered [plaintiff's] own physical safety."  *Id.* (citation and internal quotation marks omitted).

Plaintiff appears to pursue the "direct duty" theory, arguing that a "police officer has a duty

to procure medical care if he she [sic] knows or should have known that an arrestee is in need of

such care."  Pl. City Mem. at 25.  But the single case cited in support of the existence of such a duty

is dated and, in any event, is not persuasive.  In that case, *Dunham v. Village of Castro*, 303 N.Y. 498

(1952), the police had "assumed charge of the deceased when he was incoherent and unable to

represent himself" and they "knew at least that he was in pain, that he had fallen down, and that he

was in need of medical attention."  *Id.* at 503.  The court found that "[w]ith such knowledge, under

the circumstances, the . . . authorities were under a duty to obtain medical care for the deceased."  *Id.*

Here, by contrast, there has been no suggestion that Plaintiff was unable to make her own healthcare decisions like the incapacitated prisoner in *Dunham*.  There is therefore no basis to find the existence of a duty on the part of the City Defendants like the one found to exist in *Dunham*.  In addition, as discussed above, the officers offered Plaintiff medical assistance, which she declined.  Summary judgment must be granted to the City Defendants on this basis.

### I.   State Law Negligence

Plaintiff also pursues a claim of negligence against City Defendants, but neither the City Defendants nor Plaintiff discuss this claim in their briefs.  "Under New York law . . . a plaintiff must establish three elements to prevail on a negligence claim:  (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 177 (2d Cir. 2013) (quoting *Alfaro v. Wal–Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000)).

The basis for Plaintiff's negligence claim appears to be the same as the basis upon which her negligent infliction of emotional distress claim is based, namely an asserted failure on the part of the police officers involved in her detention to provide medical care.  However, as just discussed in connection with Plaintiff's negligent infliction of emotional distress claim, a reasonable jury could not find that the officers owed a duty of care to Plaintiff that they failed to satisfy, and summary judgment on this basis is appropriate with respect to her negligence claim for this reason as well.[4]

## IV.   CONCLUSION

For the reasons stated above, the City Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART, and Dr. Alam's motion for summary judgment is

---

[4] The complaint also asserts a "claim" for "*respondeat superior* liability under New York law."  The City Defendants have not moved for summary judgment on this issue, and neither they nor Plaintiff address the issue in their briefs. Accordingly, the Court does not discuss it further.

GRANTED.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 90, 96, and 98.

SO ORDERED.

Dated: March 31, 2017
New York, New York

_____
GREGORY H. WOODS
United States District Judge